IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| Omekas Letrell Moaney, #14867-171, ) | Civil Action No: 9:09-2791-HFF-BM |
| Plaintiff, ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| Michael E. Stansbury, Rodney Crawford, ) and Robert Waizenhofer, all sued both ) individually and officially, ) | |
| Defendants. ) | |

This action has been filed by the Plaintiff, pro se, pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). Plaintiff, an inmate with the Federal Bureau of Prisons (BOP), alleges excessive and unreasonable force during his arrest by the named Defendants in violation of his constitutional rights.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on February 11, 2011. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on February 15, 2011, advising Plaintiff of the importance of a motion for summary judgment and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case.

- 1 -



Plaintiff did not file a response to the Defendants' motion, but did file his own motion for summary judgment on February 22, 2011 (dated February 11, 2011). Defendants filed a memorandum in opposition to Plaintiff's motion on March 11, 2011.

These motions are now before the Court for disposition.[1]

**Background and Evidence**

Plaintiff alleges in his verified complaint[2] that on October 20, 2006 he was shot by an arresting FBI agent. Plaintiff alleges that when he was shot he was "lowering with his right arm his 15-month old nephew and then raising his left hand . . . ." Plaintiff alleges that no weapons were found on him or within the residence, and that this "excessive and reckless" use of force was premeditated.

Plaintiff alleges that a federal arrest warrant had been issued for him on July 19, 2006 for a drug conspiracy charge, and that on August 22, 2006 the Defendants Crawford and Stansbury arrived at his domicile where they encountered his girlfriend, Dorothy Chapman. Plaintiff alleges that after a consent search of the house neither Plaintiff nor any weapons were found, and that when Chapman could not offer information as to Plaintiff's whereabouts, Stansbury said "no matter, we are going kill him anyway". Plaintiff alleges that to justify the shooting, the Defendant Crawford

---

[1] This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. Both parties have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

[2] In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Plaintiff has filed a verified Complaint. Therefore, the undersigned has considered the factual allegations set forth in the verified Complaint in issuing a recommendation in this case.

- 2 -



stated that Plaintiff had made a statement to the effect that he was "not going back to jail", which the agents took to mean that Plaintiff might resist police if they tried to arrest him. Plaintiff alleges, however, that he had never been to jail. Plaintiff alleges that the agents also claimed that they were concerned because a handgun had been found in a house that Plaintiff supposedly frequented, and because of an alleged attack that in fact never occurred. Plaintiff alleges that he complied with the agents' instructions and was no threat, and that the Defendants used excessive force to effect his arrest. Plaintiff seeks monetary damages. See generally, Verified Complaint with attached Exhibit [copy of Investigator Follow-up Report].

In support of summary judgment the Defendant Michael Stansbury has submitted an affidavit wherein he attests that he is an agent with the Federal Bureau of Investigation (FBI). Stansbury attests that he has been a member of the SWAT Team for more than eight years, has attended SWAT basic school, and is also a defensive tactics instructor for the Columbia Division. Stansbury attests that he has made over twelve hundred felony arrests in his career, and that during the relevant time period he was a member of a violent gang task force targeting members and associates of the Bloods and other street gangs.

Stansbury attests that during the course of the investigation he and the Defendant Crawford identified Plaintiff as an associate of the gang organization, and that he and Crawford were able to conduct audio and video surveillance of the Plaintiff participating in drug transactions. Stansbury attests that after a first waive of indictments were issued in January 2006, which did not include the Plaintiff, as yet unindicted members of the organization, including the Plaintiff, became aware that they were under investigation. Stansbury attests that he was advised by a task force officer that Plaintiff had approached a Columbia Police Department officer and stated "I saw the list



and I am not going back to jail", or words to that effect. Stansbury further attests that he learned that Plaintiff had discussed a plan with another gang member to pour gasoline on task force Officer Chris White and set him on fire, and that he had been warned by Crawford that Plaintiff carried firearms and was suspected of having been involved in a murder.

       Stansbury attests that Plaintiff was charged with conspiracy and distribution of cocaine and crack cocaine in an indictment issued July 21, 2006, and that on July 22, 2006 at 12:45 a.m. he and other officers served a federal search warrant at a crack house allegedly operated by the Plaintiff. Stansbury attests that during the search the officers confiscated a large amount of currency, drugs, and a loaded weapon. Because agents were unable to locate the Plaintiff during this raid, they began a fugitive investigation to locate him. Stansbury attests that during this investigation there were several times when he believed they had just missed apprehending the Plaintiff. Stansbury attests that on August 21, 2006 they arrested Plaintiff's girlfriend, Dorothy Chapman, for harboring a fugitive and lying to investigators about harboring the Plaintiff, and that Chapman eventually pled guilty to providing false statements to a federal agent. Further, following Chapman's arrest, agents were able to contact the Plaintiff via telephone and urged him to turn himself in immediately. Plaintiff did not do so, however, and stopped using the phone through which they had contacted him.

       Stansbury attests that on October 20, 2006 he received a call from Crawford stating that Plaintiff had been spotted at some apartments. Stansbury met with Crawford and another agent (Jones) to formulate an arrest plan, during which Crawford stressed that Plaintiff likely would be carrying a gun and was believed to have a bullet proof vest. They were joined by the Defendant Waizenhofer, who approved an arrest plan which called for the agents to pull Jones' vehicle as close to Plaintiff as possible with all four agents inside, and to use the element of surprise to arrest him



quickly. Stansbury attests that everyone was wearing FBI tactical vests, which contained the letters "FBI" on the front and back. However, when agents did not see Plaintiff when driving around the apartments, they decided to go to Plaintiff's sister's apartment to see if he was there. Waizenhofer and Jones were to go to the rear of the apartment, while Stansbury and Crawford would go to the front door. Stansbury attests that he and Crawford walked up the sidewalk toward the front door, with their guns in their holsters. Stansbury attests that just prior to reaching the apartment he saw two little girls outside the apartment next door, and told them to go inside.

Stansbury attests that as he was approaching the front door of the apartment, he saw a black male wearing a grey shirt standing inside the apartment, near the door, and then saw the Plaintiff standing toward the back of the apartment in the vicinity of a kitchen area. Plaintiff was wearing a blue and white striped polo shirt that was untucked, covering his waistband. Stansbury attests that he made eye contact with the Plaintiff and quickly drew his weapon, yelling "FBI, get your hands up, get your hands up". Stansbury attests that Plaintiff did not comply with his instructions, so he stepped inside the apartment while continuing to yell "get your hands up". Stansbury attests that Plaintiff maintained eye contact with him and lifted his left hand half way up, bringing his arm parallel to the ground, which Stansbury interpreted as a defensive posture, not a surrendering motion. Plaintiff did not raise his right hand up. Stansbury also attests the Plaintiff was standing behind a love seat, which obstructed his view of the Plaintiff below his waist.

Stansbury attests that as Plaintiff took a step toward the love seat in an apparent effort to gain a position of cover, he reached his right hand toward his waistband, beneath his shirt on the right front side, and that based on his training and fourteen years of law enforcement experience, he knew this to be the common location on the body where individuals not wearing holsters conceal



- 5 -

handguns. Stansbury attests that Plaintiff manipulated his right hand inside his pants and moved directly behind the love seat, that he could not see all of the Plaintiff's right hand but Plaintiff appeared to be grabbing something, and that Stansbury believed he was grabbing or reaching for a gun. Stansbury attests that during this period of time Plaintiff did not say anything, but stared directly at him with what Stansbury interpreted to be a hostile and defiant look in his eyes.

By this time Crawford had also entered the apartment and yelled "watch out". Stansbury attests that he was attempting to create some distance between himself and Crawford, as well as with the other man and a woman who were also in the apartment. Stansbury attests that Plaintiff moved his eyes and body so that he continued to face and look at him, all as he continued to refuse to comply with Stansbury's repeated commands. Stansbury attests that based on his experience as well as his observations at the time, he concluded that Plaintiff had no intention of trying to flee, but was instead preparing to draw a weapon and shoot at him.

Stansbury attests that because he believed Plaintiff was drawing a weapon with the intent of shooting at him, he fired one round from his weapon. Stansbury attests that Plaintiff's demeanor immediately changed, his right hand stopped moving up and quickly dropped back down, with Plaintiff then immediately raising both hands with his palms open and stating "alright". Stansbury attests that he interpreted Plaintiff's actions to be an attempt at surrender, and as he moved closer to the Plaintiff he for the first time heard a child screaming. Stansbury attests that he then observed a child of approximately one or two years of age seated on the floor to his left, being at least six feet or more away from the Plaintiff. Stansbury attests that he had not been aware of the child being present in the apartment prior to hearing the screaming, and that he told Crawford to get the child.



Stansbury attests that as he approached the Plaintiff, he stated "you shot me". Stansbury attests that he ordered Plaintiff to the floor, handcuffed his arms behind his back and briefly patted him down for a weapon, and then called for an ambulance. Stansbury attests that he did not find a weapon when he searched the Plaintiff, but that it is standard FBI procedure to handcuff suspects during an arrest until the agent can verify that the subject no longer presents a threat of violence. Stansbury attests that Waizenhofer came in through the back door about this time, made a makeshift bandage out of some rolls of toilet paper, and applied pressure to the wound. Stansbury attests that he asked Plaintiff why he had not listened to him, and that Plaintiff responded by saying he did not know. When Stansbury asked Plaintiff his name, he replied "I am the one you are looking for".

Stansbury attests that he and Waizenhofer continued to administer aid to the Plaintiff, and that he removed the handcuffs to make Plaintiff more comfortable and to ensure he could breath properly. An ambulance then arrived, and agent Jones rode with Plaintiff in the ambulance. Stansbury attests that he believes about fifteen seconds transpired from when he first entered the apartment until he shot the Plaintiff.

Stansbury attests that although Plaintiff initially claimed during a proffer interview that he was holding his nephew when he was shot, that during a consensual interview on August 3, 2007, Plaintiff acknowledged that he had been less than truthful in claiming that he was holding a child at the time of the shooting. Stansbury further attests that he never told Plaintiff's girlfriend or anyone else that he or other agents intended to kill the Plaintiff, and that prior to the day of the shooting he had never had a confrontation with the Plaintiff and would have had no reason to state that he or others intended to kill him. Stansbury attests that on May 30, 2007 he received a letter



from the FBI's Inspection Division informing him that they had determined that his discharge of his weapon was appropriate and justified, and that the FBI's administrative inquiry was closed. See also attached Exhibit A [Letter].  See generally, Stansbury Affidavit.

The Defendant Rodney Crawford has also submitted an Affidavit wherein he attests that he is a law enforcement agent with the FBI.  Crawford confirms that he advised Stansbury as well as others that it was his understanding that Plaintiff frequently carried a gun, had discussed a plan to douse Agent Chris White with gasoline and set him on fire, and that it was suspected that Plaintiff was involved in a murder.  Crawford also attests that following the Plaintiff's indictment, the FBI obtained a search warrant for the residence Plaintiff was using for the distribution of drugs, during which the FBI recovered a loaded pistol as well as a substantial amount of crack cocaine, powder cocaine, marijuana, and U. S. currency.

Crawford attests that as a result of pre-trial negotiations with some of the defendants who had been previously indicted, the FBI developed extensive intelligence on the other indicted co-conspirators, including the Plaintiff, and that agents learned that Plaintiff was reputed to carry a handgun on his person. Crawford further attests that Plaintiff had been contacted and asked to turn himself in, but had refused to do so.  Crawford attests that on the date and time at issue, he observed a black male standing immediately inside the doorway of the apartment as he and Stansbury approached. Crawford attests that he observed Stansbury remove his pistol from his holster and yell "FBI, put your hands up, FBI let me see your hands", or words to that effect.  Crawford attest that at that moment he could not see who Stansbury was addressing, but that he [Crawford] drew his weapon and continued forward. Crawford attests that he then could see the Plaintiff standing inside the apartment, but that as he entered the apartment directly behind Stansbury, he was stuck standing



near the doorway due to the apartment's small size. Crawford attests that Plaintiff stood directly across the room from the doorway, behind a couch that had a large back support section. Plaintiff's left arm was raised, with his upper arm perpendicular to the floor. Plaintiff's right hand was down below the line of the couch, and although Crawford was unable to clearly see all of Plaintiff's right hand, he could tell that it was slightly cupped and that his right fingers were moving in a manipulating motion.

Crawford attests that, based on his experience and training, he thought Plaintiff was preparing to access a weapon. Crawford attests that they yelled at the Plaintiff to put his hands up, but that he did not reply, instead staring at them intently. Crawford attests that it did not appear that Plaintiff wanted to run, and in fact he suddenly appeared to blade his body, turning his side towards Stansbury. Crawford attests that he interpreted Plaintiff's movements to be threatening, and he yelled for Stansbury to watch out. Crawford attests that Plaintiff moved his right arm in an upward motion, that from his position it appeared that Plaintiff was drawing a weapon, and that he applied pressure to the trigger on his firearm, but did not fully squeeze the trigger. At that moment Stansbury fired his weapon.

Crawford attests that from that point on Plaintiff did not resist, and that when he and Stansbury noticed a toddler crying, Stansbury told him to get the child to safety. Crawford attests that he picked up the child and took him outside. Crawford attests that he did not see the child until after Stansbury had fired his weapon, and that no one inside the apartment had told them that any children were present. Crawford also attests that it did not appear to him that Plaintiff had been holding a child at any point during the confrontation. Crawford attests that he heard Stansbury ask Plaintiff why he had not done as instructed, and that Plaintiff replied "I don't know why", or words



to that effect. Plaintiff also said something along the lines of "I am the one you are looking for".

Crawford attests that although he did not discharge his weapon, he agrees with Stansbury's decision to use deadly force. Crawford attests that he was preparing to fire on Plaintiff at the time Stansbury discharged his weapon, and that he would have done so had Stansbury not fired first. Crawford attests that Stansbury's decision to discharge his weapon resolved a dangerous and volatile situation in which it appeared that the lives of both the agents and bystanders were in imminent danger. See generally, Crawford Affidavit.

The Defendant Robert Waizenhofer has submitted an Affidavit wherein he also attests to the same set of facts leading up to the date of the incident at issue. Waizenhofer attests that during the incident he and Agent Jones went to the apartment's back entrance, and that while at the rear entrance he heard both Stansbury and Crawford yelling "FBI, get your hands up", or words to that effect. Waizenhofer attests that he heard this command at least three times. Waizenhofer attested that he could see into a back window of the apartment, and that from his vantage point he could clearly see that Plaintiff was not holding his hands up to indicate a wish to surrender, that he was moving side to side, and that he was not complying with instructions that were being given by Stansbury and Crawford. Waizenhofer attests that he next heard a gunshot, and then saw Plaintiff raise both of his hands. Waizenhofer attests that there was no movement by the Plaintiff to indicate that he had been shot, and that he [Waizenhofer] was not sure at first who had fired the shot.

Waizenhofer attests that following the gunshot, Jones tried to force an entry into the rear door, but that fearing that Jones might expose himself to possible crossfire, he ordered Jones away from the rear door. Jones then went around to the front door to lend assistance to Crawford and Stansbury. Waizenhofer attests that he then looked back in the window, saw Stansbury standing



over the Plaintiff, who, at that time, was lying on the floor, following which he got the back door open and made entry into the residence. Waizenhofer attests that he did not notice any children in the apartment before Stansbury fired his weapon, and that he never observed Plaintiff to be holding a child. See generally, Waizenhofer Affidavit.

Finally, Bryan Jones has submitted an affidavit wherein he attests that he is an agent with the FBI, and was present at the subject apartment on October 20, 2006. Jones attests that he and Waizenhofer were approximately ten feet from the back of the apartment when they heard Stansbury and Crawford giving verbal commands to "get your hands up", or words to that effect, several times. Jones attests that he was not in front of a window so could not see into the apartment, but when he and Waizenhofer heard a shot followed by additional commands, they drew their guns in response. Jones attests that he tried to kick in the back door of the apartment, but Waizenhofer told him to get away from door because it was in the line fire. Jones then ran around to the front of the apartment, where he found Stansbury and Crawford with the Plaintiff. Plaintiff was laying handcuffed on the floor. Jones attests that once the ambulance arrived, he rode in the back of the ambulance with the Plaintiff, and that once they arrived at the hospital paramedics took him to the emergency room for treatment.

Jones attests that he did not see Stansbury discharge his weapon, but that nothing he saw or heard on the day in question suggested that Stansbury's use of force was unreasonable or unjustified. Jones notes that Plaintiff was a fugitive in hiding who was considered armed and dangerous, and that both Stansbury and Crawford issued several forceful warnings before Stansbury used his weapon. See generally, Jones Affidavit.



In support of his motion for summary judgment, Plaintiff has submitted an affidavit wherein he attests that prior to the incident in question he had been convicted of a weapons violation at the age of nineteen, had one other felony drug conviction in 2005, with any other charges against him being traffic court offenses. Plaintiff concedes in his affidavit that after being indicted in 2006, he did not voluntarily turn himself in to authorities and remained at large. Plaintiff also attests that when agents searched his girlfriend's house in August 21, 2006, he was present and hidden in the far right front corner of the attic. Plaintiff attests that during the search he overheard agents tell Chapman that "you don't have to tell us where [Plaintiff] is because we are going to kill him anyway."

Plaintiff attests that on October 20, 2006 he was in the apartment, and that as he left the kitchen area of the house with a trash can in his left hand and his nephew in his right arm heading towards the living room, he noticed the front door slowly open in a sweeping motion and the barrel of a gun as the door opened. Plaintiff attests that Crawford and Stansbury then came through door yelling "FBI, get your hands up." Plaintiff attests that he was scared and surprised, and raised his left hand while lowering his nephew to the floor with his right hand. Plaintiff attests that there was no reasonable way for him to raise his hand without first lowering the child to the floor and then attempting to comply with the agents, "although not as quickly as agent Stansbury wanted". Plaintiff attests that Stansbury "fired an almost deadly shot at just seeing [Plaintiff's] hand move in an upward motion, which was consistent with the orders given." Plaintiff further attests that, while the agents deny ever seeing any toddlers in the house, that this claim is contradicted by several statements of the other adults in the house at the time of the shooting. See generally, Plaintiff's Affidavit.

Plaintiff also has attached a copy of pages six through eight of Stansbury's affidavit,



and pages five through 6 of Crawford's affidavit. Additionally, Plaintiff has attached as an Exhibit a portion of a statement taken from "Brown" [apparently the female in the apartment], in which it is reported that this individual stated that Plaintiff grabbed one of the children and had it in his hands when the police came in. This statement further indicates:

> [s]he said the officers told [Plaintiff] to hold his hands up but he let go of the child and refused to do as told. He put his hand behind his back as if he was reaching for something. [Brown] stated the officers told [Plaintiff] three times to put his hands up. She said he was still reaching for something when the officer shot him. [Brown] said she could only see [Plaintiff's] upper body and his hand was not visible because he stood behind the chair the entire time. She said that because of [Plaintiff's] actions she thought he had something behind his back and was a threat to everyone inside the apartment.

See Plaintiff's Exhibit [Moaney 110].

Plaintiff has also attached as an exhibit what purports to be a statement from someone named "Reeves", apparently Brown's boyfriend. Reeves' statement is as follow:

> [Reeves] said that shortly before the shooting he had gone to the door to check on his daughter who was outside. At this time he observed that the police was coming through the door and he recognized them because of the clothing they wore and they also announced "police" as they entered. [Reeves] said that [Plaintiff] (whom he referred to as the guy) "got one of the twins". He went on to say that police kept telling [Plaintiff] to show his hands but he disobeyed. [Reeves] went on to say that the officers told [Plaintiff] again to show his hands but again he disobeyed and that is when the officers shot him. [Reeves] said that he felt [Plaintiff's] actions were threatening to the officers and others inside the house because "if he had given up it would have all been over". He said that during the entire altercation [Plaintiff] never said anything to the police.

See Plaintiff's Exhibit [Moaney 111].

Finally, Plaintiff has attached a copy of his police interview, which reads as follows:

> [Plaintiff] stated that he was inside [the] apartment when the FBI agents entered the front. There were two of them both of which had their guns drawn. He recognized them as FBI agents because he saw the insignia on their jackets. He said he was just leaving the kitchen and had [ ] in his right and a trash can in the other. When asked,



> [Plaintiff] stated he was not standing behind any type of furniture, but in the open area. [Plaintiff] said he let go of the trash can but still had the child in his right hand. He says that this time he told the agents that he was the person they were looking for. He stated they were yelling for him to get down. [Plaintiff] further states he was asking the agents "please don't shoot me, just don't hurt me". He went on to say that as he was putting his nephew down to the floor he was shot by one of the agents. After he was shot [Plaintiff] says, he "basically" let go of the child and told the agents he was shot, to which [Plaintiff] states one of the agents told him "get down before I shoot you again". [Plaintiff] went on to say the agents placed rags they found somewhere inside the apartment on his chest and applied pressure. They asked him if there was anything they could do to make him comfortable.

See Plaintiff's Exhibit [Moaney 112].

### Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the arguments and evidence presented, the undersigned finds and



concludes that the Defendants are entitled to summary judgment in this case.

In Bivens, the Supreme Court established a direct cause of action under the Constitution of the United States against federal officials for the violation of federal constitutional rights. See Harlow v. Fitzgerald, 457 U.S. 800, 814-820 (1982).[3] Hence, as federal officials, all of the named Defendants are subject to suit under Bivens for damages in their individual capacities, and Plaintiff alleges a constitutional claim by asserting that he was subjected to excessive use of force by the Defendants in violation of his Fourth Amendment rights.[4]

Under the Fourth Amendment, claims of excessive use of force during an arrest are considered under an "objective reasonableness" standard. Orem, 523 F.3d at 446; Smith v. Kendall, No. 09-6452, 2010 WL 764051 (4th Cir. Mar. 8, 2010). This test requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Tennessee v. Garner, 471 U.S. 1, 8 (1985); White v. Town of Chapel Hill, 899 F.Supp. 1428, 1435 (M.D.N.C. 1995), aff'd, 70 F.3d

---

[3]A Bivens claim is analogous to a claim under 42 U.S.C. § 1983. However, federal officials cannot be sued under 42 U.S.C. § 1983 because they do not act under color of *state* law. See Harlow, 457 U.S. at 820. Harlow and progeny indicate that case law involving § 1983 claims is applicable in Bivens actions and *vice versa*. Farmer v. Brennan, 511 U.S. 825 (1994). See also Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); Turner v. Dammon, 848 F.2d 440, 443-444 (4th Cir. 1988); Osabutey v. Welch, 857 F.2d 220, 221-223 (4th Cir. 1988); and Tarantino v. Baker, 825 F.2d 772, 773-775 (4th Cir. 1987), cert. denied, North Carolina v. Tarantino, 489 U.S. 1010 (1989)

[4]"The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person." Riley v. Dorton, 115 F.3d 1159, 1161 (4th Cir. 1997)(en banc), abrogated on other grounds, Wilkins v. Gaddy, 130 S.Ct. 1175 (2010)(citing Graham v. Conner, 490 U.S. 386, 388 (1989)). Thereafter, the Fourteenth Amendment due process clause protects a pre-trial detainee from the use of excessive force that amounts to punishment. Graham, 490 U.S. at 395, n. 10. In the case at bar, the Fourth Amendment applies to Plaintiff's excessive force claim because the events he alleges transpired incident to his being taken into custody. Orem v.Rephann, 523 F.3d 442, 446 (4th Cir. 2008).



1264 (4th Cir. 1995); Sweatt v. State of Maryland, No. 89-3231, 1989 WL 126582 at **1 (4th Cir. 1989).  What is objectively reasonable depends on what conditions exist at the time the alleged excessive force is used, recognizing that police officers are often forced to make split  second judgments in circumstances that are tense, uncertain, and rapidly evolving; Graham v. Connor, 490 U.S. at 396; see Greenidge v. Ruffin, 927 F.2d 789 (4th Cir. 1991);  and when considering a police officer's actions under this "objective reasonableness" standard, the Court must consider the circumstances of the particular case, including the severity of the crime committed, whether the subject posed an immediate threat to the safety of the police officers or others, and whether the subject was actively resisting arrest or attempting to evade arrest.  Graham, 490 U.S. at 396; see Foote v.  Dunagan, 33 F.3d 445, 447-448 (4th Cir. 1994); Martin v. Gentile, 849 F.2d 863, 869 (4th Cir. 1988).

      Here, considered in the light most favorable to the Plaintiff, the evidence reflects that the Defendant had been charged in a serious drug conspiracy as well as with being a member of a violent street gang, the Defendants had information that he had a propensity for violence and was often armed, and even Plaintiff concedes that he was a fugitive who was on the run and had refused to turn himself in to law enforcement.  Further, at the time of the incident the Defendants had forced their way into a small apartment to confront the Defendant and attempt to take him into custody, and a fair reading of the evidence (including Plaintiff's own evidence) is that, when confronted by Stansbury and Crawford and told to get his hands up, or words to that effect, Plaintiff did not comply.  See, Plaintiff's Exhibit, Moaney 110.  ["[Plaintiff] refused to do as told.  He put his hand behind his back as if he was reaching for something . . . . officers told him three times to put his hands up . . . . he was still reaching for something when the officer shot him"]; Plaintiff's Exhibit,





Moaney 111. ["[P]olice kept telling [Plaintiff] to show his hands but he disobeyed . . . . and that is when the officer shot him . . . . [the witness] felt [Plaintiff's] actions were threatening to the officers and others inside the house . . . ."]. Significantly, there is also no evidence that, once Plaintiff was handcuffed and under control, any further physical force was used against him. Wilson v. Flynn, 429 F.3d 465, 469 (4th Cir. 2005)["[Plaintiff] does not allege that the officers used any improper force after restraining him; this fact distinguishes [Plaintiff's] case from many in which we have held the Plaintiff has alleged an excessive force claim."].

Plaintiff's own self serving statements that he did nothing wrong and that Stansbury's use of force against him under the circumstances was unjustified is not sufficient to survive summary judgment in light of this overwhelming contrary evidence, including the statements of Plaintiff's own witnesses that he failed to comply with the officer's instructions and appeared to be reaching for something when he was shot. See Silvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995)[Explaining that while the party opposing summary judgment is entitled to the benefit of inferences that can be drawn from the evidence, "[p]ermissible inferences must still be within the range of probability" and that "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary"(internal quotation marks omitted)]; see also House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]. Given the facts known to Stansbury at the time, the actions of the Defendant as shown by the evidence, and the circumstances of this particular case, it was certainly objectively

- 17 -

reasonable for Stansbury to believe that Plaintiff posed an immediate threat to his safety or to the safety of other officers or bystanders.  Graham, 490 U.S. at 396.  While, in response to the circumstances and situation presented, Stansbury did use potentially deadly force (the firing of his weapon), that fact does not in and of itself transform Stansbury's actions to unconstitutional "excessive" force given the situation he was facing.  Sanchez v. Obando-Echeverry, 716 F.Supp.2d 1195, 1207 (S.D.Fla. 2010)[Finding that, "the severity of the injury alone does not transform the police officers' action . . . from a good faith attempt to effectuate an arrest based on probable cause to a bad faith imposition of excessive force."]; Gashi v. County of Westchestor, No. 02-6934, 2007 WL 749684 at * 7 (S.D.N.Y. Mar. 12, 2007); see also Waterman v. Batton, 393 F.3d 471, 476-477 (4th Cir. 2005)["[A] police officer may employ deadly force when the officer has 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others'"], quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985); cf. Sigma v. Town of Chapel Hill, 161 F.3d 782, 788 (4th Cir. 1998)[Affirming summary judgment where officer acted on the "perception" that Plaintiff had a weapon]; Greenidge v. Ruffin, supra [same]; Slattery v. Rizzo, 939 F.2d 213, 215-216 (4th Cir. 1991)[Finding that deadly force was appropriate when the suspect failed to comply with the officer's orders to raise his hands and the officer reasonably believed the suspect to be coming at him with a weapon]; McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994)[Officer entitled to use deadly force when the officer had reason to believe the suspect was armed].

With respect to the remaining Defendants, while not personally involved in the alleged act of excessive force at issue, a law enforcement officer who is otherwise a bystander may be held liable for an act of excessive force where they are confronted with a fellow officer's illegal act and possess the power to prevent it but fail to do so.  Randall v. Prince George's County, MD.,



302 F.3d 188, 203 (4th Cir. 2002); see also O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2nd Cir. 1988)[observing that officer who stands by and does not seek to assist the victim could be "tacit collaborator"].  Here, however, there is not sufficient evidence to create a genuine issue of fact of an illegal act by Stansbury.  Therefore, there is no evidence of a constitutional violation being committed by any of these other Defendants.

## Conclusion

Based on the foregoing, it is recommended that the Plaintiff's motion for summary judgment be **denied**, that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

April 4, 2011
Charleston, South Carolina





**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).